UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PORT OF SOUTH LOUISIANA                          CIVIL ACTION

VERSUS                                           NO: 11–3065 c/w 12-433

TRI-PARISH INDUSTRIES, INC., ET AL.              SECTION: "H"(4)

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This maritime action arises from the discovery of a barge (the "CAPTAIN FRANKS") buried beneath the bed of the Mississippi River adjacent to a tract of riparian property (the "Batture Property"). Plaintiff Port of South of Louisiana (the "Port")—the owner of the Batture Property—encountered the sunken CAPTAIN FRANKS while constructing a finger pier.[1] The Port seeks damages for the cost of removing the CAPTAIN FRANKS and for delay of its finger pier project. Following a slew of pre-trial motions, the only claims remaining for trial are (1) a general

---

[1] The Port also discovered two other obstructions in addition to the CAPTAIN FRANKS.

1

maritime negligence claim against Tri-Parish Barge, Inc. ("TP Barge"), and (2) an ancillary veil-piercing claim against Charles Augustine ("Augustine").

This matter was tried before the undersigned without a jury.  Having considered the evidence admitted at trial and the arguments of counsel, the Court announces its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.  To the extent a finding of fact constitutes a conclusion of law,  the Court adopts it as such.  To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

**FINDINGS OF FACT**

The dispositive issue in this case is whether TP Barge owned, controlled, or caused the CAPTAIN FRANKS to sink.  Before making findings specific to this issue, the Court provides a brief overview of the relevant background facts.

**I. Background**

1.      On April 17, 1985, Reserve Barge, Inc. ("Reserve Barge") sold to Cargo Transfer, Inc. ("Cargo Transfer") the Batture Property, certain movable property, and several leases.  One of the movable items is described as follows in the sale documents under the subheading "Other Barges:"

    CAPTAIN FRANKS – 3 – 17" square spuds x 40'

2.      Augustine signed the sale documents as president of Cargo Transfer.

3.      On May 11, 1988, Cargo Transfer sold to TP Barge the Batture property and the same movable property that Cargo Transfer previously purchased from Reserve Barge.

4.      Augustine is the vice-president, treasurer, and director of TP Barge; William Dupree ("Dupree") is the secretary.  Dupree signed the sale documents on behalf of TP Barge as vice-president.

5.      On May 12, 1989, TP Barge sold the Batture Property to Tri-Parish Industries, Inc. ("TP Industries").  The sale did not include any movable property.

6.      Augustine signed the sale documents on behalf of TP Industries as president.

7.      On April 9, 2009, the Port expropriated the Batture Property from TP Industries for the purpose of expanding a docking facility along the Mississippi River.[2]  The Port hired Continental Construction, Co. ("Continental") to serve as general contractor.

8.      Continental began driving test pilings in August 2010.  Work was halted shortly thereafter when Continental encountered three large underwater obstructions.   Continental contracted with Inland Salvage ("Inland") to raise and remove the obstructions.

9.      One of the obstructions—buried approximately twelve feet below the riverbed—was a barge bearing the nameplate CAPTAIN FRANKS.  The CAPTAIN FRANKS measured approximately 120 ft. x 40 ft. x 7 ft. and contained three spudwells (but no spuds).  There

---

[2] The Port insists it only expropriated one parcel of the Batture Property; the Defendants disagree. The Court need not resolve this issue.

were no marks or any other indication of ownership on the CAPTAIN FRANKS.

10.     Inland scrapped the CAPTAIN FRANKS within one week of removal.  Neither the Port nor

TP Barge inspected the CAPTAIN FRANKS after it was removed.

**II.  Whether TP Barge Owned, Controlled, or Caused the CAPTAIN FRANKS to Sink**

11.     The Port does not know when the CAPTAIN FRANKS sank, how the CAPTAIN FRANKS sank,

or who owned the CAPTAIN FRANKS when it sunk.

12.     TP Barge did not purchase the CAPTAIN FRANKS.

13.     TP Barge purchased three 40-foot long, 17-inch square spuds associated with the CAPTAIN

FRANKS.  The evidence adduced at trial provides ample support for this finding.

a.      Attachment 1 to the sale documents between Reserve Barge and Cargo Transfer is

a 5-page list of the movable property transferred.  The property is divided into

categories.  The first page of Attachment 1 describes the property as follows:

Dock Barges:
TJ298 – 120 x 30 x 7 – Foamed
TJ338 – 120 x 30 x 7 – 2 Spuds, 15" square x 40'
TJ137 – 120 x 30 x 7 – Foamed
TJ154 – 120 x 30 x 7 – Foamed
HARAHAN – 120 x 35 x 7 – 1 spud well – no spud
TJ332 (Beauregard) – 120 x 30 x 7 – 1 spud 18"
                square x 40'
ARABI – 120 x 30 x 7 – 1 spud 16" square
TJ158 – 120 x 30 x 7
LAFITTE – 100 x 35 x 7 – 2  17" square spud  x 40'
                    – 40'  Ramp
EMPIRE – 100 x 35 x 7 –  2   17" square spuds

4

                        1  18" square spud
WGH 31 − 180 x 50'

Other Barges:
TJ135UF − 120 x 30' x 7' − Foamed
BURRAS − 100 x 30' x 7'
TJ0UF − 6' x 10' x 3' − Welding Flat
TJ2UF − 26' x 12' x 3' − Welding Flat
TJ411UF − 48' x 18' x 3' − Welding Flat
TJ268UF − Rigging barge with 8 x 8 x 6 container
CAPTAIN FRANKS − 3 − 17" square spuds x 40'

b.    A plain reading of page one of Attachment 1 strongly suggests that Cargo Transfer

only purchased three 40-foot long, 17-inch square spuds associated with a barge

named CAPTAIN FRANKS rather than the barge itself.  Sixteen of the eighteen

barges are described with barge-like dimensions.  Other than the CAPTAIN FRANKS,

the only item which does not have barge measurements is identified as "TJ268UF."

In lieu of such measurements, however, TJ268UF is described as a "rigging barge,"

leaving little doubt that the item transferred was, in fact, a barge.[3]  Moreover, the

description of the spuds for the CAPTAIN FRANKS is consistent with that for spuds

---

[3] Page two of Attachment 1 describes four other barges under the heading "Crane Barges."
Although only one of the barges is described with barge-like dimensions,  three of the four contain a "6-
Cylinder Cat Diesel Engine."  The LASALLE is not listed as having an engine but specifically states that there
are "No Spuds on Barge."  Thus, unlike the listing for CAPTAIN FRANKS, each of the items under "Crane
Barges" contains a descriptor which strongly suggests the item is a barge and not just a set of spuds.

listed under "Dock Barges" and "Crane Barges."[4]

c.    The remainder of the trial record underscores the plain reading of the sales documents.  No representative of Cargo Transfer or TP Barge has ever heard of, much less seen, the CAPTAIN FRANKS prior to this litigation.  Moreover, the Port did not elicit testimony from anyone with personal knowledge of the movable property that Cargo Transfer purchased from Reserve Barge.  The only visual evidence of the CAPTAIN FRANKS offered was a series of photographs taken by a representative of Inland.  The photographs clearly demonstrate the presence of three spudwells, which further suggests Cargo Transfer purchased from Reserve Barge three spuds belonging to the CAPTAIN FRANKS.

14.    Cargo Transfer did not purchase the CAPTAIN FRANKS from Reserve Barge.  Thus, TP Barge could not have purchased the CAPTAIN FRANKS from Cargo Transfer.

15.    TP Barge did not control the CAPTAIN FRANKS, cause it to sink, and was not otherwise aware that it sunk.

---

[4] The Port contends that had Cargo Transfer only purchased three square spuds, those items would have been described on pages three and four of Attachment 1, which lists miscellaneous types of equipment such as work flats, welding machines, wash pumps, shipyard supplies, hoppers, and containers.  Crucially, however, there are no items described as spuds on these pages.  Quite the contrary, all spud listings are found under the subheadings "Dock Barges," "Other Barges," and "Crane Barges."

**CONCLUSIONS OF LAW**

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333, which confers on the federal district courts original jurisdiction over maritime claims.  Venue is proper, because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Louisiana.  *See* 28 U.S.C. § 1391(b)(2).

1.   Negligence is an actionable wrong under the general maritime law. *Withhart v. Otto Candies, LLC*, 431 F.3d 840, 842 (5th Cir. 2005).  In order to prevail, the plaintiff must demonstrate that: (1) the defendant owed a duty; (2) the defendant breached that duty; (3) the plaintiff sustained damages; and (4) the defendant's wrongful conduct caused his damages.  *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010).

2.   The threshold inquiry in any negligence analysis is whether a duty is owed *vel non*.  *See In re Signal Int'l, LLC*, 579 F.3d 478, 491 (5th Cir. 2009).  Determination of a tortfeasor's duty is a question of law.  *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000).

3.   A maritime tortfeasor's standard of care is derived from positive law, custom, and the general principles of tort law. *See S.C. Loveland, Inc. v. E. W. Towing, Inc.*, 608 F.2d 160, 165 (5th Cir. 1979); 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 5–2 (5th ed. 2013).  The Port urges this Court to look to 33 U.S.C § 409 (the "Wreck Act") in determining the existence and scope of TP Barge's duty.  Although the Wreck Act is a criminal statute, it also establishes a standard of care applicable in ordinary maritime negligence actions.  *See*

7

*Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 462 (5th Cir. 1984) (en banc); *Inland Tugs Co. v. Ohio River Co.*, 709 F.2d 1065, 1068 n.1 (6th Cir. 1983); *Chute v. United States*, 610 F.2d 7, 10 (1st Cir. 1979).

4.      "When the doctrine of negligence per se applies, the general standard of care of a reasonable man is replaced by a specific rule of conduct established in a statute or regulation."  *Dougherty v. Santa Fe Marine, Inc.*, 698 F.2d 232, 234 (5th Cir. 1983).  The Wreck Act requires the "owner, lessee, or operator" of a sunken vessel that obstructs navigation to immediately (1) mark the wreck, and (2) commence removal.  *See* 33 U.S.C. § 409.[5]

5.      TP Barge did not own, lease, or operate the CAPTAIN FRANKS.  Therefore, the statutory duties imposed by the Wreck Act do not apply.[6]

6.      Having concluded the doctrine of negligence *per se* is inapplicable and finding custom equally inapplicable, the remaining question is whether a duty may be imposed from the general principles of tort law.  *See Loveland*, 608 F.2d at 165.   Under those principles, "[d]uty . . . is measured by the scope of the risk that negligent conduct foreseeably entails."

---

[5] The Fifth Circuit has noted, however, that the Wreck Act is not a strict liability statute.  *Nunley*, 727 F.3d at 459.  Rather, the owner's duty and response thereto is viewed in terms of negligence: "If the owner diligently and in good faith endeavors to carry out that duty, this circuit has refused to find that he has breached a statutory duty."  *Id.* at 460.

[6] Accordingly, the Court need not decide whether the CAPTAIN FRANKS actually obstructed navigation.

*Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) (alteration in original).  Given that TP Barge did not own, control, or cause the CAPTAIN FRANKS to sink—nor was TP Barge even aware that the CAPTAIN FRANKS had sunk—there is simply no basis under the law for imposing a duty.

7.     TP Barge owed no duty to the Port.  Accordingly, the Port's negligence claim fails, as does its veil-piercing claim against Augustine.  *See Port of S. La. v. Tri-Parish Indus., Inc.*, 2013 WL 2394859, at *3 (E.D. La. May 28, 2013) ("A veil-piercing claim is ancillary—it is not actionable unless a corporate defendant is cast in judgment.")

## CONCLUSION

The Port's failure to prove that TP Barge owed a duty sinks its general maritime negligence claim.  Accordingly, all remaining claims are DISMISSED WITH PREJUDICE.  Judgment will be entered in favor of Defendants.

New Orleans, Louisiana, this 20th day of May, 2014.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**